UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY BOBULINSKI,

    *Plaintiff*,

    v.

DANIEL GOLDMAN,

    *Defendant*.

Civil Action No. 24-00974 (AHA)

## Memorandum Opinion

    Anthony Bobulinski brought this suit alleging that Congressman Daniel Goldman defamed him on social media by making comments related to Bobulinski's meetings and testimony in the U.S. House of Representatives. The United States asks to be substituted as the defendant, arguing that Congressman Goldman made the alleged defamatory comments within the scope of his federal employment, and moves to dismiss the case based on sovereign immunity. The parties agree the sole issue is whether Congressman Goldman was acting within the scope of his employment. If so, the United States is properly substituted as the defendant and Bobulinski's defamation claims must be dismissed due to sovereign immunity. If not, Bobulinski may proceed with his defamation claims against Congressman Goldman. The Court concludes Congressman Goldman's comments about Bobulinski's congressional meetings and testimony were within his scope of employment and grants the United States' motion to dismiss.

**I.    Background**

    Before testifying, Bobulinski sat for an interview with the House Committee on Oversight and Accountability about "conduct he witnessed by Joseph Biden, Hunter Biden, and Biden Family

business associates." ECF No. 16 ¶ 18; *see id.* ¶¶ 24, 28–29. After the interview, Congressman Goldman—himself a committee member—directed a social media post to the committee's chair saying: "You brought in a Trump campaign plant to peddle your same lies." *Id.* ¶ 28. A couple days later, the committee released transcripts of its interview with Bobulinski, and Congressman Goldman wrote: "Now release the video you took of the interview so that everyone can see what partisan actors the witness and his Trump-funded attorney were." *Id.* ¶ 29.

In March 2024, Bobulinski testified before the committee. *Id.* ¶ 18. The next day, Congressman Goldman posted: "Tony Bobulinski has used a Trump campaign-paid lawyer to make false allegations since October 2020." *Id.* ¶ 25. Congressman Goldman also described Bobulinski's testimony as "Russian disinformation." *Id.* ¶ 26. And the day after that, Congressman Goldman posted: "If @RepJamesComer means referring Bibulinski [sic] for lying to Congress then he has finally stumbled onto a good idea." *Id.* ¶ 27 (alteration in original). According to the operative complaint, Congressman Goldman posted some of these comments on his official social media account and others on his personal account. *Id.* ¶¶ 25–27.

Bobulinski's complaint asserts two counts of defamation, and alleges that Congressman Goldman's statements were false and made "deliberately and maliciously . . . to discredit Mr. Bobulinski's testimony and to besmirch Mr. Bobulinski's character." *Id.* ¶¶ 33, 43–61. The United States certified that Congressman Goldman was acting within the scope of his duties as a federal official when making the challenged statements and argues that Bobulinski's claims are therefore properly asserted against the United States (also known as a "Westfall certification"). ECF No. 20-1. The United States also moves to dismiss the case, arguing it has sovereign immunity and the Court therefore lacks subject matter jurisdiction. ECF No. 20; *see* Fed. R. Civ. P. 12(b)(1).

**II.    Discussion**

"The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)). "When a federal employee is sued for wrongful or negligent conduct," the Attorney General may certify "that the employee 'was acting within the scope of his office or employment at the time of the incident.'" *Id.* at 229–30 (quoting § 2679(d)(1), (2)). Upon certification, the employee is dismissed from the action, the United States is substituted as the defendant, and the tort claims are governed by the Federal Tort Claims Act ("FTCA"). *Id.* at 230. If the tort claim is not one for which the FTCA waives sovereign immunity, the certification "has the effect of altogether barring plaintiff's case." *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir. 2009). The parties agree that is the case here—if Congressman Goldman's comments were within the scope of his employment and the United States is therefore substituted as the defendant, then sovereign immunity bars Bobulinski's defamation claims.

A plaintiff may contest the United States' certification, however, and Bobulinski does so here. *Id.* at 381. In such circumstances, the certification is "*prima facie* evidence that the employee was acting within the scope of his employment." *Id.* (citation omitted). "To rebut the certification, the plaintiff must allege, in either the complaint or a subsequent filing, specific facts 'that, taken as true, would establish that the defendant['s] actions exceeded the scope of [his] employment.'" *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013) (alterations in original) (citation omitted). The scope of employment inquiry is governed by "the substantive law of the jurisdiction where the employment relationship exists" and, here, the parties agree the question is governed by District of Columbia law. *Id.* at 221; *see* ECF No. 20 at 4; ECF No. 22 at 4.

3

Under District law, Congressman Goldman's conduct was within his scope of employment. District law generally defines the scope of employment based on the test set out in the Restatement (Second) of Agency:

> Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master.

*Jacobs*, 724 F.3d at 221 (alteration in original) (quoting Restatement (Second) of Agency § 228 (1958)); *see also Trump v. Carroll*, 292 A.3d 220, 229 (D.C. 2023) ("[W]e confirm that the District of Columbia has formally adopted the language of § 228(1)-(2) to define the scope of employment, but we depart from its language or otherwise construe some of its language more broadly at times."). Here, all three requirements are satisfied.

Under the first, conduct may be within the scope of employment if it is "either 'of the same general nature as' *or* 'incidental to' the conduct authorized." *Carroll*, 292 A.3d at 230 (citation omitted). The inquiry focuses on "the type of act [the defendant] took that allegedly gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221. The challenged conduct here—commenting to the public about newsworthy issues and matters taking place before House committees—is authorized and, indeed, a central part of the job for members of Congress. *See, e.g.*, *Wuterich*, 562 F.3d at 384 ("[T]he underlying conduct—interviews with the media about the pressures on American troops in the ongoing Iraq war—is unquestionably of the kind that Congressman Murtha was employed to perform as a Member of Congress."); *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006) ("Besides participating in debates and voting on the Congressional floor, a primary obligation of a Member of Congress in a

representative democracy is to serve and respond to his or her constituents." (quoting *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995)))). And, today, such engagement with the public often occurs on social media. *See, e.g.*, *Does 1–10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) ("There is no meaningful difference between tweets and the other kinds of public communications between an elected official and their constituents that have been held to be within the scope-of-employment under the Westfall Act."). Congressman Goldman was publicly expressing his views on Bobulinski's appearance before the House Oversight Committee, which involved allegations of "lies" and "corruption" within the family of the President of the United States. ECF No. 16 ¶¶ 15, 24. Those are clearly newsworthy matters for both the public and Congress.

Bobulinski would have the Court define the duties of members of Congress more narrowly to exclude Congressman Goldman's comments, citing a Congressional Research Service ("CRS") report and internal House manuals. ECF No. 22 at 6–17. He argues that Congressman Goldman's statements do not fall into any of the categories delineated by the CRS report. *Id.* at 7–11. Even accepting that characterization of the documents cited, the Court declines to adopt such a limited understanding of the congressional role. The six-page CRS report does not purport to be an exhaustive description of a member's responsibilities; in fact, it emphasizes that "there is no formal set of expectations or official explanation of what roles or duties are required." Cong. Rsch. Serv., RL33686, *Roles and Duties of a Member of Congress: Brief Overview* 1 (Feb. 15, 2022). And as noted, courts have routinely found that communicating with the public about newsworthy issues is a core responsibility of lawmakers. *See, e.g.*, *Ballenger*, 444 F.3d at 665 (rejecting as "far too cramped" the view that a member's appropriate conduct is limited to "core legislative functions such as drafting and lobbying for legislation"); *cf. United States v. Brewster*, 408 U.S. 501, 512 (1972) (noting that members of Congress engage in a wide range of activities, including "preparing

5

so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress").[1]

Congressman Goldman's comments were also "substantially within the authorized time and space limits," satisfying the second element. The D.C. Court of Appeals has held that to satisfy this prong, "[t]he employee's conduct does not need to be absolutely within the authorized space and time of the employment, only 'substantially,' which counsels against a strict understanding of where and when an employee was on duty." *Carroll*, 292 A.3d at 232–33. "Defining the authorized space and time of employment is more difficult for employees who are by the nature of their job 'always on duty.'" *Id.* at 233. But "the employer is generally only liable under *respondeat superior* for their 'always on duty' employee while the employee is sufficiently engaged with their employment." *Id.*

Here, Congressman Goldman made the alleged defamatory statements substantially within the space and time authorized for a member of Congress. As the D.C. Circuit has recognized, "service in the United States Congress is not a job like any other." *Ballenger*, 444 F.3d at 666 (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1312 (D.C. Cir. 1995)). Members of Congress might be required to make public statements on pressing issues at any time of the day or night. So Bobulinski's assertion that Congressman Goldman made one of the statements "outside

---

[1] Bobulinski appears to characterize the statements as outside the scope of employment simply because they are defamatory. *See, e.g.*, ECF No. 22 at 11 (describing the "conduct at issue" as "making false and defamatory statements"); *id.* at 17 ("While the United States may contend that commenting on witnesses before Congress is a duty of [congressmen], it is *not* within their duties to falsely accuse witnesses of perjuring themselves."). That approach is squarely foreclosed by precedent, which makes clear that a court must "focus on the type of act [the defendant] took that allegedly gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221; *see also, e.g.*, *Ballenger*, 444 F.3d at 664 ("The appropriate question, then, is whether [the underlying] telephone conversation—not the allegedly defamatory sentence—was the kind of conduct [the defendant] was employed to perform.").

of normal office hours" is not persuasive. ECF No. 22 at 18; *see* ECF No. 16 ¶ 34 (alleging that one post "was even made outside of work hours, made at 8:03 AM"). It would make little sense to conclude that members of Congress act beyond their duties by commenting on newsworthy topics outside of conventional work hours. And for that matter, it is not even obvious that 8:03 a.m.—the time of the post Bobulinski identifies—can be fairly characterized as "outside of work hours." For similar reasons, it is not dispositive that some of the posts came from Congressman Goldman's personal account rather than his official account. *See* ECF No. 22 at 18–20; ECF No. 16 ¶¶ 27, 29, 35. All the statements were related to Bobulinski's appearance before the House Oversight Committee and, regardless of which account he was posting from, Congressman Goldman was commenting on newsworthy issues that were "sufficiently engaged" with his employment. *See Carroll*, 292 A.3d at 233.

The final element asks "whether, in the moments surrounding the employee's conduct, there is evidence that the employee was, in fact, motivated by the purpose of serving the master." *Id.* at 238. This standard "necessitates at least some discernable purpose to serve the employer," but it "does not foreclose that an employee could be concurrently motivated by a personal purpose." *Id.* at 235.

This requirement too is satisfied. The allegations in the complaint do not suggest that Congressman Goldman acted solely for his own purposes in commenting on Bobulinski's testimony. Other courts have concluded that public communications by elected officials "were calculated to serve the interests of Defendants' constituents (i.e., employers) by informing them of Defendants' views regarding a topical issue and related legislation." *Does*, 973 F.3d at 602; *see also, e.g.*, *Wuterich*, 562 F.3d at 385 (concluding that defendant's alleged attempts to discredit Secretary of Defense were "part and parcel of [his] job as a legislator charged with overseeing

7

military affairs and of his efforts to serve his constituents by advancing legislation to bring home American troops stationed in Iraq"); *Ballenger*, 444 F.3d at 665 (holding that defendant's conduct was at least partially motivated "by a legitimate desire to discharge his duty as a congressman"). The same is true here: Congressman Goldman was making public statements on issues that were newsworthy and taking place before the legislative body—indeed, one of the committees—where he represents his constituents.

Bobulinski maintains that a "fabricated allegation of perjury" could not have served the interests of the United States. ECF No. 22 at 21; *see also id.* at 23 ("It cannot be said that a United States Congressman is employed for the purpose of personally attacking and defaming the character of a citizen, or anyone, or accusing them of a federal crime."). But the point is that Congressman Goldman was remarking on newsworthy matters, and proceedings before the legislative body in which he serves, as part of his duties as a member of Congress. If Bobulinski's framing were correct, and a plaintiff could defeat a Westfall certification simply by asserting that defamatory statements do not serve the government's interests, it would be difficult to see when a defendant in such a defamation action would ever be within the scope of employment. That approach would contravene well-established precedent upholding Westfall certifications in defamation cases. *See, e.g.*, *Jacobs*, 724 F.3d at 224; *Wuterich*, 562 F.3d at 387; *Ballenger*, 444 F.3d at 666.

### III. Conclusion

Because Congressman Goldman acted within the scope of his employment in posting the relevant statements, the United States is properly substituted as the defendant under the Westfall Act. "Sovereign immunity bars suits against the United States absent an explicit and unequivocal waiver," and Bobulinski has not disputed that no such waiver exists here. *See Ballenger*, 444 F.3d

at 666. The United States' motion to dismiss for lack of subject matter jurisdiction is granted and this action is dismissed without prejudice.

    A separate order accompanies this memorandum opinion.

_____
AMIR H. ALI
United States District Judge

Date: June 18, 2025